## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**JOHN A. SIGLEY,**

     **Plaintiff,**

**v.**
                **Civil Action No. 1:04CV184**
                **(The Honorable W. Craig Broadwater)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

     **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("the Defendant" sometimes "the Commissioner") denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. PROCEDURAL HISTORY

John A. Sigley ("Plaintiff") filed an application for DIB on February 26, 2003, alleging disability as of June 28, 2002, due to back problems, which include degenerative disc disease and disc protrusion (R. 78-80, 82). Plaintiff's applications were denied at the initial and reconsideration levels (R. 34-35). Plaintiff requested a hearing, which Administrative Law Judge Edward Banas ("ALJ") held on November 13, 2003 (R. 202-28). Plaintiff, represented by counsel, Regina Carpenter, testified on his own behalf (R. 208-22). Also testifying was Vocational Expert Jim Ganoe ("VE") (R. 222-27). On November 26, 2003, the ALJ entered a decision finding Plaintiff

was not disabled (R.14-23). On June 29, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-6).

## II. FACTS

Plaintiff was born on April 21, 1968, and was thirty-five (35) years old at the time of the administrative hearing (R. 209-210). He attained a General Equivalency Diploma, and his past relevant work was as a fuel jockey (medium/unskilled), in building maintenance (medium/unskilled), as a construction laborer (heavy/unskilled), and as a maintenance and equipment operator (heavy/skilled) (R. 86, 223).

On June 28, 2002, Plaintiff injured his back when he slipped at his job with the West Virginia Department of Highways (R. 125, 128). He reported to the emergency department of Fairmont General Hospital and was diagnosed with an acute strain and low back pain (R. 126).

On July 31, 2002, Plaintiff was examined by Eric T. Jones, M.D., of Mountainstate Orthopedic Associates, located in Morgantown, West Virginia. Plaintiff reported to Dr. Jones that he experienced back pain when he coughed, sneezed, or lifted. Plaintiff stated his pain was reduced when he would lie down, sat down, or took pain and muscle relaxer medications. Plaintiff informed Dr. Jones that the pain was located "above the thoracolumbar junction and down at the lumbosacral junction." Dr. Jones observed Plaintiff appeared healthy and in no distress. He opined Plaintiff had "some tenderness at the thoracolumbar junction but . . . good motion" in that he moved well in all directions. Plaintiff's straight leg raising was negative; his strength, sensation, and reflexes were normal. Plaintiff presented with no hip irritability and no trochanteric irritation. Dr. Jones reviewed "thoracic and lumbar spine films," which appeared to be "pretty normal" to him. He observed "no significant degenerative disk changes, etc." He opined Plaintiff could "safely do a physical therapy

2

program," and referred him for physical therapy (R. 180).

On August 5, 2002, Plaintiff reported for physical therapy at HealthWorks Rehab & Fitness, located in Fairmont, West Virginia. His course of treatment was for extension exercises and modalities, which were to occur three (3) times per week for six (6) weeks (R. 137). Plaintiff underwent physical therapy on August 7, August 9, August 12, and August 14, 2002 (R. 133-36).

On August 28, 2002, Plaintiff returned to Dr. Jones, who opined Plaintiff's pain had "narrowed down a little lower" and was located in his lumbar spine. Plaintiff informed Dr. Jones that physical therapy was "not helping at all." Dr. Jones referred Plaintiff for an MRI because there were no radicular findings (R. 185).

On September 8, 2002, Plaintiff underwent an MRI of his lumbar spine, which showed minor disc bulging at L3-4 and L4-5 and central midline disc protrusion at L5-S1 which was "effacing the . . . thecal sac" and may have been "impinging the S1 nerve roots at their origin from the thecal sac" (R. 130, 192).

On September 9, 2002, Dr. Jones opined that Plaintiff had "degenerative disks at three different levels, 3-4, 4-5, and S1" and a "central disk protrusion that may be giving him some of his grief." Dr. Jones decided Plaintiff should undergo "some trunk stabilization exercises" and ordered "a new physical therapy referral" (R. 185).

On September 16, 2002, Plaintiff returned to HealthWorks for physical therapy. He stated his pain was unchanged and was "4/10" (R. 132). Plaintiff did not attend physical therapy on September 18, 2002, as scheduled (R. 121).

On September 27, 2002, Dr. Jones examined Plaintiff and opined his back pain continued, but he was not experiencing any leg pain. Dr. Jones prescribed a "warm-n-form back support" and

3

referred Plaintiff to a pain clinic (R. 186). Dr. Jones corresponded with West Virginia Workers' Compensation on this date, requesting authorization for a "lumbosacral warm-n-form type back support" and for referral to a pain clinic for Plaintiff (R. 179).

On October 28, 2002, Plaintiff was examined by Dr. Jones. Plaintiff stated he had been "doing somewhat better some days." Dr. Jones opined Plaintiff was "unable to return to his previous employment" and expressed doubt as to whether Plaintiff would "ever be able to return to his previous employment" due to the "MRI changes at multiple disc levels and his response to any kind of activity." Dr. Jones noted he would later evaluate the effect of the "Warm-N-Form" back support" on Plaintiff (R. 159).

On December 27, 2002, Plaintiff reported to Dr. Jones that he was not "doing any different" in that Plaintiff thought his conditions was "just about the same as when he originally hurt himself . . . ." Dr. Jones noted Plaintiff had "really not followed through with the pain clinic at all even though he was approved for this back in September" and he was "not sure what he has been doing at all." Dr. Jones observed Plaintiff continued taking Lortab for pain. Dr. Jones recommended Plaintiff return to the pain clinic, and he also suggested Plaintiff was an "ideal candidate for the OASIS program" (R. 184). On December 27, 2002, Dr. Jones corresponded with West Virginia Workers' Compensation, requesting approval for 1) Plaintiff to attend a pain clinic; 2) Plaintiff to be provided Lortab 5mg; and 3) Plaintiff to be evaluated by the OASIS program since he was "certainly . . . not a surgical candidate with this back pain and degenerative disc disease" (R. 178).

On January 10, 2003, Plaintiff underwent an independent low back examination by Jack S. Koay, M.D., for purposes of applying for Workers' Compensation. Dr. Koay observed Plaintiff stood unassisted and presented with no paraspinal muscle tenderness or spasm or sacroiliac joint

tenderness. Plaintiff's gait was normal and he could squat fully and rise with no difficulty (R. 141). Plaintiff's motor strength was 5/5 and normal and sensory was normal (R. 142). Plaintiff's patellar reflexes were "+3" left and right and achilles reflexes were "+2" left and right. Plaintiff's straight leg raising test produced back pain at fifty (50) degrees left and forty-five (45) degrees right. Plaintiff presented with no hip or sacroiliac pain (R. 142). Plaintiff's pain was constant at a scale of "6/10." Plaintiff complained of intermittent numbness in both thighs and weakness in the lower extremities (R. 149). Dr. Koay considered the findings of Dr. Jones, the results to Plaintiff of physical therapy, and the results of Plaintiff's MRI (R. 151-52). Dr. Koay's clinical impression was for a "sprain type injury on the lower back at the lumbar area without focal neurological findings." He concluded that Plaintiff's lower back condition had not reached maximum medical improvement and that Plaintiff was temporarily totally disabled (R. 152). Dr. Koay recommended Plaintiff receive treatment at a pain clinic, use a TENS unit, and return in three (3) months for further evaluation (R. 153).

On February 10, 2003, Plaintiff was evaluated and examined at the West Virginia Pain Treatment Center by Kenneth R. Noel, M.D. Plaintiff's chief complaint was for low back pain, which radiated to his buttocks and both lower extremities. Plaintiff stated to Dr. Noel that his pain was "continuously present" and "worsened by activity and by protracted sitting." Plaintiff further stated his pain was "improved somewhat by the medications that have been prescribed for him, . . . by rest . . . [and] by application of heat" (R. 199). Dr. Noel's examination of Plaintiff revealed the following: 1) normal gait and station; 2) flexion nearly full at about sixty (60) degrees with low back pain; 3) extension was full with right sacroiliac pain; 4) full rotation and lateral tilt without pain; 5) positive right quadrant test with pain; 6) negative left quadrant test; 7) all muscle strength

was 5/5; 8) patellae and ankle reflexes were "+2" and symmetric; 9) seated straight leg raising positive bilaterally at ninety (90) degrees; 10) supine straight leg raising positive on left at forty-five (45) degrees and on right at sixty (60) degrees; 11) Patrick's test positive bilaterally with right sacroiliac joint pain; 12) nontender trochanteric bursae and piriformis muscles; 13) tender sacroiliac joints on left; 14) severely tender sacroiliac joints on right; and 15) diffuse tenderness in the vicinity of the lumbar facet joints, particularly at L4-5 and L5-S1. Dr. Noel's diagnosis was for "sciatica secondary to lumbar disc disease and spinal stenosis" and "right sacroiliac arthropathy" (R. 200). Dr. Noel recommended lumbar epidural steroid injection, right sacroiliac injection, possible radiofrequency treatment, and the care of a primary physician. Dr. Noel recommended epiduroscopy as a long-term treatment plan. Dr. Noel noted Plaintiff declined "all interventions at this time" and that, therefor, Plaintiff "should probably be considered to be at Maximum Medical Improvement" (R. 201).

On March 21, 2003, Plaintiff returned to Dr. Jones for a follow-up examination. Plaintiff informed Dr. Jones that he was "not doing any better whatsoever" and that physical therapy made his symptoms worse. Plaintiff stated he had visited the pain clinic. The physicians at the pain clinic "wanted to give him an epidural steroid injection" and Plaintiff "ran away from that." Dr. Jones observed Plaintiff was having "more troubles not a lot," Plaintiff had experienced "virtually all back pain" in the past, and Plaintiff had begun experiencing "right buttock pain." Dr. Jones ordered an MRI (R. 157). Also on March 21, 2003, Dr. Jones corresponded with West Virginia Workers' Compensation Fund, requesting approval for a MRI so he could "make sure that there is not a further problem" with Plaintiff's lumbar spine (R. 158).

On June 2, 2003, a state agency physician completed a Physical Residual Functional Capacity

Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk for a total of about six (6) hours in an eight (8) hour workday, sit for a total of about six (6) hours in an eight (8) hour workday, and push/pull unlimited (R. 162). The state agency physician found Plaintiff was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 163). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 164-65). The state agency physician found Plaintiff had no environmental limitations except that he should avoid concentrated exposure to extreme cold and hazards (R. 165). The state agency physician reduced Plaintiff's RFC to light (R. 166). The state agency physician did not agree with the opinion of Dr. Jones that Plaintiff continued to be disabled and not able to return to his work (R. 167).

On June 9, 2003, Jack Stemple, M.D., completed an Independent Medical Evaluation of Plaintiff for West Virginia Worker's Compensation Fund. Plaintiff informed Dr. Stemple he was taking Lortab as needed. Plaintiff stated that in addition to his low back pain and thigh numbness, he had experienced intermittent chest pain for six (6) months. He was urged by Dr. Stemple to seek the care of a family physician for this symptom (R. 188). Dr. Stemple observed Plaintiff's knee jerks to be "3+ and equal" and his ankle jerks to be "2+ and equal." Plaintiff's straight leg raising test when seated produced right back and leg pain. His supine straight leg raising test was fifteen (15) degrees on the right and twenty (20) degrees on the left. Dr. Stemple's impression was for lumbar sprain and lumbar disk displacement with radiculitis. Dr. Stemple noted Plaintiff "refused epidural steroid injection" because he was "concerned that it might cause him permanent injury and paralysis." Dr. Stemple informed Plaintiff as to the rarity of permanent injury and paralysis occurring with epidural steroid injection and that "he would gain good benefit from it." Dr. Stemple

expressed "some concern" that Plaintiff may have ankylosing spondylitis and noted the reasonableness of Plaintiff undergoing the "HLA-B27 antigen test" to rule out such diagnosis. Dr. Stemple opined Plaintiff had not achieved "maximum medical improvement" and could not return to "his usual and customary work at this point in time." He expressed hope that Plaintiff could return to his former work "after he has had treatment and further evaluation (R. 189).

On July 23, 2003, Dr. Jones corresponded with Plaintiff's rehabilitation counselor at Progressive Vocational Services, located in Morgantown, West Virginia, noting therein that Plaintiff had not reached maximum medical improvement. He opined Plaintiff would "probably . . . benefit from an epidural steroid injection." Dr. Jones also noted he did not "think" Plaintiff was "capable of returning to his usual and customary work." Dr. Jones recommended Plaintiff receive a "lumbar epidural steroid injection initially," followed by physical therapy, work hardening, and a functional capacity evaluation (R. 175).

On October 4, 2003, Plaintiff underwent an MRI of his lumbar spine. It revealed the following: 1) central disc protrusion at L5-S1, "which indents the anterior thecal sac by 3.1 mm, but the exiting and the traversing nerve roots . . . do not appear to be compressed by this disc protrusion" and 2) "mild broad-based disc bulges at L3-4 and L4-5, neither of which result in spinal stenosis or appear to affect the exiting-traversing nerve root" (R. 193).

On October 6, 2003, Dr. Jones spoke on the telephone with Plaintiff about the results of the October 4, 2003, MRI. Dr. Jones recommended to Plaintiff during that conversation that he undergo a lumbar epidural steroid injection. Dr. Jones also opined that Plaintiff would benefit from an OASIS evaluation because OASIS was "likely to be able to get him back to work" (R. 182).

On October 6, 2003, Dr. Jones wrote a letter wherein he stated Plaintiff had been

8

"undergoing conservative treatment with the hopes that we could get him back to work." He noted Plaintiff had "degenerative disks at multiple levels" and that his October 4, 2003, MRI showed "that he has some mild spinal stenosis at L3-4, more significant stenosis at L4-5 with a left sided disk prominence, and also a swollen nerve root on the left side of his MRI." Dr. Jones opined Plaintiff was "disabled and unable to return to work" and had "not arrived at his maximum degree of medical improvement" (R. 173).

On October 16, 2003, Plaintiff's counsel corresponded with Dr. Jones. Within that correspondence, Plaintiff's counsel made the following statement and asked the following two questions: "[Plaintiff] tells us that he has to lie down periodically throughout the day to control his pain to a tolerable level. Is this a reasonable restriction given Mr. Sigley's medical condition? If so, could you please explain why?" A handwritten response appears on Plaintiff's counsel's letter. It reads: "Yes" and "[t]o relieve back pain." It was signed by Dr. Jones on October 27, 2003 (R. 191).

At the November 13, 2003, administrative hearing, Plaintiff testified that he could not "bend over and pick something up" and that his back felt as if it went "out of joint," as though it became "dislocated" (R. 213). These episodes caused pain in Plaintiff's legs, which he treated with heat applications, pain medication, sessions in a "whirlpool," and lying down (R. 213-14). Plaintiff testified his back gave out twice a month and this caused him to lie in bed for "two or three days at times." Plaintiff agreed with the ALJ's description that he was "pretty functional" on his "good days" (R. 214). Plaintiff testified he slept "pretty decent" at times, but not at others. He stated he slept best when he took pain medication for when his "back goes out" (R. 215). Plaintiff testified that on his "good days," he could not do "whatever activities" he desired because he feared his back

would become "dislocated again." Plaintiff stated he experienced constant pain that he ranked "four to six" on a scale of "one to ten." He testified his pain increased with standing (R. 216).

At the administrative hearing, Plaintiff testified that he had undergone an MRI but had yet to be evaluated by the OASIS program (R. 218-19). Plaintiff stated he had not received a lumbar epidural steroid injection as recommended by Drs. Jones, Noel, and Stemple because he 1) "could never really get a clear answer from the doctors exactly what the injection does"; 2) would "have to wear a diaper"; and 3) he could not have sex (R. 219-20). Plaintiff testified that neither doctor discussed the possibility of rehabilitation through lumbar epidural steroid injections (R. 220).

Plaintiff stated he was able to cut his grass, but it took him "twice as long"; he occasionally cared for his two-year-old child (R. 221-22).

At the administrative hearing, Plaintiff's attorney informed the ALJ that Dr. Jones had been asked "a very specific question about the need . . . [for Plaintiff] to lie down during the day" and that "Dr. Jones did say that he believed that the need to lie down during the day was a reasonable restriction in order to relieve, help relieve, the pain" (R. 207-08).

The ALJ asked the VE at the administrative hearing to consider if work would be preclusive for an individual who experienced "intermittent pain problems a couple times a month . . . [because] his back [gave] out and he can't move and he's in really severe pain." The VE responded that work would "[n]ot necessarily" preclusive for such an individual. The ALJ asked if work would be preclusive for an individual who "had to be off more than three or four days a month," and the VE responded in the affirmative. The ALJ asked if work would be preclusive for an individual who was absent from work "one or two" days per month, and the VE testified that such a person "could sustain employment" (R. 224). The ALJ asked the VE the following hypothetical question: consider

10

"a younger individual with a GED education, prior work history similar to that of the Claimant" who "would be out . . . two days a month . . . because of a trick back where he just suffers constant, severe, and unremitting pain and can't do anything" but who "[t]he remainder of the time . . . might be limited to light exertion. Has to have a sit/stand option. And just simple routine type repetitive jobs that wouldn't take a great deal of concentration. And it wouldn't entail . . . bending over at the waist level . . . he might be able to do stooping with the upper back. But couldn't do any bending over and . . . lifting from the ground up. Could you identify . . . any jobs that there might be . . . with those kinds of limitations?" The VE responded as follows: "Under the light exertional level, Your Honor, ticket seller, 219,000 nationally, 1,600 regionally. Price marker, 319,000 nationally, 1,675 regionally. Bench assembly, 400,000 nationally, 3,000 regionally. Those are the sampling, Your Honor" (R. 224-25). The ALJ stated, "this would be predicted only if the hypothetical individual is going to not miss more than two days a month because of his back?" The VE responded, "Yes . . . . If an individual, on a consistent basis, . . . misses more than three days per month, employment is usually precluded. . . . [T]here is just no employment out there." The ALJ provided to the VE Exhibit 10F (Plaintiff's counsel's October 16, 2003, letter to Dr. Jones which contained Dr. Jones' opinion that Plaintiff would have to "lie down periodically throughout the day . . . to relieve back pain" (R. 191)) for review by the VE and then asked the VE the following: "Now what about a limitation as far as lying down? . . . Now if we have that restriction added on, would that have any impact on . . . ?" The VE responded, "Well, it would certainly have an impact on it. The exhibit doesn't state – it says lie down periodically. And . . . for my purposes I . . . need that [the meaning of periodically] clarified." The VE testified there was not enough information in the letter for him to make a judgment as to limits" (R. 226).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Banas made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7.  The claimant has the following residual functional capacity: claimant can perform light work with a sit/stand option; simple jobs with routine repetive [sic] tasks requiring no bending at the waist level, no lifting from the ground up, or stooping with the upper back.

8.  The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9.  The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

10. The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

11. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

12. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 404.967).

13. Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.20 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a ticket seller, a grid marker, a bench assembly worker.

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)) (R. 21-22).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the

reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.      The ALJ erred in failing to address in any fashion the treating doctor's medical opinion that Plaintiff would need to lie down periodically throughout the day to control his pain.

The Commissioner contends:

1.      The ALJ did not err in assessing Dr. Jones' statement about Plaintiff's need to lie down.

## C. Treating Doctor's Opinion

Plaintiff contends the ALJ erred in failing to address in any fashion the treating doctor's medical opinion that Plaintiff would need to lie down periodically throughout the day to control his pain in violation of SSR 96-2p. Defendant contends the ALJ did not err in assessing Dr. Jones' statement about Plaintiff's need to lie down.

Plaintiff contends "SSR 96-2p requires the ALJ to address a treating physicians [sic] medical opinions and to follow a very specific four step analysis" [Plaintiff's brief at p. 6]. The four-step analysis as prescribed in SSR 96-2p to determine whether the treating physician's opinion will be afforded controlling weight is as follows:

Controlling weight.      This is the term used in 20CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

•      The opinion must come from a "treating source," as defined in

14

20CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

- The opinion must be a "medical opinion." Under 20CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See **SSR 96-5P**, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")

- The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

- Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight.

In determining the weight to be afforded to the treating physician, the ALJ followed the criteria established in SSR 96-2p in that, in his decision, he noted Dr. Jones' role as Plaintiff's "treating physician" and recognized the medical opinions of Dr. Jones as to Plaintiff's condition. The ALJ evaluated and considered the medical opinion Dr. Jones offered on July 31, 2002, that 1) Plaintiff appeared healthy and in no distress; 2) Plaintiff's "back showed some tenderness at the thoracolumbar junction"; 3) Plaintiff demonstrated "good motion and moved well in all directions"; 4) Plaintiff's straight leg rasing test was negative; 5) Plaintiff had normal strength, sensation, and reflexes; and 6) Plaintiff had no hip irritability or trochanteric irritation. Dr. Jones opinion that the

x-ray of Plaintiff's thoracic and lumbar spine were normal was also considered by the ALJ (16). The ALJ assessed Dr. Jones' August 28, 2002, medical opinion that Plaintiff's symptoms were isolated in the lumbar spine and he had no radicular findings (R. 17). The ALJ also considered Dr. Jones' September 27, 2002, opinion that Plaintiff had "failed physical therapy" and might benefit from the use of a "warm-n-form back brace" and treatment at a pain clinic inasmuch as the MRI showed "some degenerative changes" (R. 17). The ALJ evaluated Dr. Jones' opinion, expressed on October 28, 2002, that Plaintiff had improved "somewhat . . . but not a lot," that he "was still unable to return to his previous employment," and may never be able to return to previous employment (R. 17). The ALJ considered and evaluated Dr. Jones' December 27, 2002, comment that he "was unsure what the claimant had been doing in regards to treatment" and his medical opinions, which included the following: 1) Plaintiff had "failed to follow through with any treatment"; 2) Plaintiff failed to get treatment at a pain clinic, "although the claimant had been approved by worker's compensation in September 2002 to receive treatment"; 3) Lortab was Plaintiff's only treatment for pain; and 4) Plaintiff was "an ideal candidate for the OASIS program." The ALJ recognized Dr. Jones' intention to seek reapproval for pain clinic treatment and for approval to engage in OASIS participation for Plaintiff (R. 17). Finally, the ALJ contemplated the October 6, 2003, medical opinion of Dr. Jones that Plaintiff was unable to return to work based on his reading of October 6, 2003, MRI, but that he agreed with Dr. Stemple, who opined that Plaintiff had not reached maximum medical improvement (R. 19).

In continuing his assessment as to controlling weight being assigned to the treating physician, the ALJ considered "clinical and laboratory diagnostic techniques," specifically the two MRI's of Plaintiff's lumbar spine. The September 8, 2002, MRI considered by the ALJ "revealed minor disc

bulging at L3-4 and L4-5 level without evidence of central stenosis or neural element encroachment, and central midline disc protrusion focal at the L5-S1 disc level, which was effacing the anterior thecal sac and may have been impinging the S1 nerve roots at their origin from the thecal sac" (R. 17). The ALJ also considered and weighed the October 6, 2003, MRI, which "revealed central disc protrusion at L5-S1 which indented the anterior thecal sac by 3.1mm, but the exiting and traversing nerve roots could be seen relatively well and did not appear to be compressed by the disc protrusion. Additionally mild broad-based disc bulges were seen at L3-4 and L4-5, neither of which resulted in spinal stenosis or appeared to affect the exiting-traversing nerve root" (R. 19).

Finally, in conducting the controlling weight analysis, the ALJ examined the treating source's medical opinion to determine if it was "'not inconsistent' with the other 'substantial evidence' in the individual's case record." There is substantial evidence in the evidence of record which is inconsistent with Dr. Jones' medical opinion relative to Plaintiff's impairments and treatments therefor. The ALJ considered the opinion of Dr. Koay, who performed an independent examination of Plaintiff's low back for Workers' Compensation on January 10, 2003, that Plaintiff "could stand unassisted and had no scoliosis, antalgic lean, lumbar hypolordosis, lumbar hyperlordosis, vertebral tenderness or restriction, coccyx tenderness, paraspinal muscle tenderness, paraspinal muscle spasm or sacroiliac joint tenderness" (R. 17-18). The ALJ also evaluated Dr. Koay's observation that Plaintiff's walk, gait, leg length, muscle, dorsalis pedis, and posterior tibial pulses were normal (R. 17-18). The ALJ evaluated Dr. Koay's observation that Plaintiff's straight leg raising was positive for pain in both sitting and supine positions but he had no indication of somatic amplification of pain. The ALJ considered Dr. Koay's diagnosis of a "sprain type injury on the lower back at the lumbar area without focal neurological findings" and findings that Plaintiff had not reached

maximum medical improvement and was temporarily totally disabled. Dr. Koay's recommendations that Plaintiff should be "seen, treated and evaluated in a pain clinic" and use a TENS unit to relieve his pain was also considered by the ALJ (R. 18).

Additional substantial evidence of the record noted by the ALJ, which was inconsistent with the opinion of Dr. Jones was provided by Dr. Noel (R. 191). The ALJ considered Dr. Noel's observations that Plaintiff's 1) "lumbar spine and lower extremities revealed nearly full flexion that produced some low back pain and full extension that resulted in right sacroiliac pain"; 2) "rotation and lateral tilt were full without pain"; 3) straight leg raising was positive bilaterally at 90 degrees; 4) supine straight leg raising was positive on the left at 45 degrees and on the right at 60 degrees; 5) tender sacroiliac joints; and 6) diffuse tenderness of the lumbar facet joints, "particularly the L4-5 and L5-S1." The ALJ considered and evaluated Dr. Noel's diagnosis of "sciatica secondary to lumbar disc disease and spinal stenosis, and right sacroiliac arthropathy," recommendation that Plaintiff should receive "lumbar epidural steroid injections and right sacroiliac injection with possible radiofrequency treatment" to relieve pain, and opinions that Plaintiff should seek the care of a primary care physician and was at maximum medical improvement since he refused to "undertake all these interventions" (R. 18).

Clearly, "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). The failure to comply with treatment recommendations supports the ALJ's inference that a claimant's symptoms are not as severe as asserted. Hunter v. Sullivan, 993 F.2d 31 (4th Cir.1992). Simply stated, a claimant must follow prescribed treatment to be entitled to social security benefits if the treatment will restore the ability to work. 20 C.F.R. § 404.1530. Accordingly, a claimant's repeated missing of appointments

may tend to support a finding that [her] impairments are not as severe as alleged. Pitman v. Massanari, 2001 WL 435685, 7 (W.D.N.C. 2001) (citing Gross, supra, 785 F.2d at 1166; and Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994)). The ALJ did question Plaintiff's credibility regarding his allegations of pain and limitations. He noted Plaintiff was "referred to a pain treatment clinic for treatment of his low back pain but he has refused to receive the treatment that was offered even after being informed that the risks he feared from this treatment was really unfounded." The ALJ also considered that "Dr. Jones, the claimant's treating orthopedist reported on December 27, 2002, that he had no idea what treatment the claimant was pursuing since he had not followed through on any treatment offered" (R. 19). Plaintiff refused lumbar epidural steroid injections recommended by his physician as a low-risk treatment, successful in alleviating pain such as he experienced. Accordingly, the undersigned finds ALJ's determination relative to Plaintiff's continuing disability based on pain and limitations is also supported by Plaintiff's refusal to undergo recommended treatment.

The ALJ also considered the evidence of record provided by Dr. Stemple. Specifically, he noted Dr. Stemple's observations that Plaintiff had normal reflexes and pain with straight leg raising and "continued to refuse treatment of epidural steroid injection" because Plaintiff "was concerned that this may cause him permanent injury and paralysis." The ALJ considered Dr. Stemple's information and advice to Plaintiff that the "occurrence of injury from epidural injections was rare and he would likely benefit from this treatment." The ALJ assessed Dr. Stemple's opinion that Plaintiff was "not capable of returning to his usual and customary work at the time of the evaluation but hopefully would be able to do so after he received more treatment and evaluation" (R. 18).

In continuing his assessment of inconsistent evidence of record, the ALJ considered the

opinion of the state agency physician, who "opined that the claimant could lift/carry 10 pounds frequently and 20 pounds occasionally, could stand/walk about six hours in an eight hour workday, could sit about six hours in an eight hour workday, could perform postural activities occasionally, and should avoid concentrated exposure to extreme cold and hazards (machinery, heights, etc)" (R. 19). This state agency physician also rejected the opinion of Dr. Jones that Plaintiff was unable to return to work (R. 167).

Based on the foregoing assessment, the ALJ, in his decision, found as follows relative to the assignment of weight to medical opinions:

> The undersigned has considered all medical opinions provided regarding the claimant's limitations and allegations. Although Dr. Jones opines that the claimant is disabled based on the earlier MRI that reported that the disc bulge "may" impinge on nerve roots (Exhibit 2F), a later MRI performed on October 6, 2003 did not show any root impingement. (Exhibit 11F/2) All examining and treating physicians report that the claimant has not yet reached maximum medical improvement, which is a worker's compensation concept. They report that he is unable to return to his past relevant work. The undersigned agrees with this. However, the state agency medical consultant reviewed the medical evidence and opined that the claimant retained the residual physical capacity to perform light work based on objective findings. (Exhibit 6F/2) The undersigned agrees with this persuasive opinion and gives it great weight. Objective medical findings show that the claimant's spinal impairments are relatively mild. There has been only conservative treatment recommended, much of which the claimant has refused to undertake. No treating or examining physicians have opined that the claimant is a candidate for surgical intervention. The claimant only takes pain medication as needed. Therefore, the treating physicians' [sic] objective findings have been given great weight in the determination of the claimant's residual functional capacity; however, their [sic] opinions of total disability are given little weight as the objective findings do not support total disability and the finding of disability is reserved for the commissioner (R. 19-20).

The ALJ, in the above recounted discourse, noted substantial, persuasive, and contradictory evidence to rebut Dr. Jones' medical opinion relative to Plaintiff's impairments and treatments therefor. He explicitly acknowledged the October 2003 MRI does not support Dr. Jones' opinion;

he referred collectively to the remaining objective medical findings by Drs. Koay, Noel, Stemple, and the state agency physician, which were detailed in the body of his decision and noted above, that showed mild spinal impairments; he recognized the conservative treatment prescribed for Plaintiff's pain, which included his taking pain medication as needed and not requiring surgery; and he acknowledged Plaintiff's failure to partake in recommended treatment plans as recounted by Drs. Jones, Noel, and Stemple (R. 19).

According to 20 CFR § 404.1527(d), when the treating source's opinion is not entitled to controlling weight, it must be weighed according to the following factors: 1) examining relationship, 2) treatment relationship, including length of treatment relationship and frequency of examinations and nature and extent of treatment relationship, 3) supportability, 4) consistency, and 5) specialization. In conformance with 20 CFR § 404.1527, the ALJ, in assigning "little weight" to the medical opinions of Dr. Jones, considered each of these factors as follows: 1) the examining relationship of not only Dr. Jones, but the examining relationship and opinions of Drs. Koay, Noel, Stemple, and the state agency physician; 2) Dr. Jones having served as Plaintiff's treating physician from June, 2002, through October, 2003, and his having encouraged Plaintiff to receive treatment for his pain through physical therapy, from a pain clinic, and through the OASIS program; 3) Dr. Jones having supported his determination as to Plaintiff's disability, in part, on an October, 2003, MRI, which "revealed central disc protrusion at L5-S1 which indented the anterior thecal sac by 3.1mm, but the exiting and traversing nerve roots could be seen relatively well and did not appear to be compressed by the disc protrusion. . . ." and "mild broad-based disc bulges were seen at L3-4 and L4-5, neither of which resulted in spinal stenosis or appeared to affect the exiting-traversing nerve root"; 4) the inconsistencies between the opinion of Dr. Jones and the other examining

physicians as to Plaintiff's degree of disability as discussed above; and 5) acknowledging Dr. Jones as "claimant's treating orthopedist" (R. 16-20).

As to the contention that the ALJ "failed to address in any fashion the treating doctor's medical opinion that [Plaintiff] would need to lie down periodically throughout the day to control his pain" [Plaintiff's brief at p. 5], the undersigned finds the ALJ did consider same as it appeared in Dr. Jones' response to the question posed in Plaintiff's counsel's October 16, 2003, letter in his decision (R. 191). Without directly quoting the letter or using the language contained in the correspondence, the ALJ did consider Dr. Jones' opinion that it was a "reasonable restriction" that Plaintiff would need to "lie down periodically throughout the day" . . . "to relieve back pain" as follows: ". . . however, their [sic] opinions of total disability are given little weight as the objective findings do not support total disability . . ." (R. 20, 191). As discussed herein, "the objective findings" that "do not support total disability" to which the ALJ referred are in the form of

1) Dr. Koay's diagnosis of a "sprain type injury on the lower back at the lumbar area without focal neurological findings" and his opinion that Plaintiff should seek treatment at a pain clinic and use a TENS unit for relief of pain. Dr. Koay did not recommend to Plaintiff that he should lie down to relieve pain (R. 18);

2) Dr. Noel's diagnosis of "sciatica secondary to lumbar disc disease and spinal stenosis, and right sacroiliac arthropathy" and recommendation that Plaintiff should receive "lumbar epidural steroid injections and right sacroiliac injection with possible radiofrequency treatment" to relieve pain. Dr. Noel did not recommend lying down as a treatment for Plaintiff's pain (R. 18);

3) Dr. Stemple's observations that Plaintiff had normal reflexes and pain with straight

leg raising and "continued to refuse treatment of epidural steroid injection." Dr. Stemple did not prescribe lying down as a remedy for Plaintiff's pain (R. 18);

4) The rejection of Dr. Jones' opinion that Plaintiff was disabled by the state agency physician (R. 19, 167); and

5) The result of the October 2003 MRI, which "revealed central disc protrusion at L5-S1 which indented the anterior thecal sac by 3.1mm, but the exiting and traversing nerve roots could be seen relatively well and did not appear to be compressed by the disc protrusion. . . ." and "mild broad-based disc bulges were seen at L3-4 and L4-5, neither of which resulted in spinal stenosis or appeared to affect the exiting-traversing nerve root" (R. 19).

Even though it would have been appropriate for the ALJ to explicitly state Dr. Jones' opinion that it was a "reasonable restriction" restriction that Plaintiff would need to "lie down periodically throughout the day" . . . "to relieve back pain," his paraphrase is sufficient in incorporating that restriction and shows the ALJ considered the limitation and rejected it because the above noted and discussed objective finding of Drs. Koay, Noel, Stemple and the state agency physician and the results of the October 2003 MRI (R. 191).

Further, the ALJ was under no obligation under SSR 96-2p to seek clarification of Dr. Jones' opinion that Plaintiff would need to "lie down periodically throughout the day" . . . "to relieve back pain" under SSR 96-2p (R. 191). SSR 96-2p reads as follows:

> Also, in some instances, additional development required by a case . . . may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record.

23

. . .

> Ordinarily, development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed. However, in cases at the administrative law judge (ALJ) or Appeals Council (AC) level, the ALJ or the AC may need to consult a medical expert to gain more insight into what the clinical signs and laboratory findings signify in order to decide whether a medical opinion is well-supported or whether it is not inconsistent with other substantial evidence in the case record.

The ALJ was under no mandate to further develop the record relative to clarifying Dr. Jones's opinion so he could assign it controlling weight; consulting a medical expert for clarification is left to the discretion of the ALJ. The undersigned finds the record was adequately developed; the clinical signs and laboratory findings supported the opinions of Dr. Koay, Dr. Noel, Dr. Stemple, and the state agency physician, but not Dr. Jones' opinion that Plaintiff had to periodically lie down to relieve pain. Additionally, Dr. Jones' medical opinion relative to Plaintiff's need to lie down was inconsistent with the medical opinions contributed by of Dr. Koay, Dr. Noel, Dr. Stemple, and the state agency physician, which constituted substantial evidence in the fully developed case record.

In consideration of all which, the undersigned finds the ALJ did not err in his assignment of weight to the treating physician; the ALJ did not err in considering and weighing the treating source's opinion relative to Plaintiff's need to "lie down periodically throughout the day" . . . "to relieve back pain"; the ALJ did not err in conducting the controlling weight analysis in conformance with SSR 96-2p; and substantial evidence exists to support the ALJ's decision.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's

applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _30_ day of September, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE